UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

GATER ASSETS LIMITED,

               Plaintiff,

-against-

AO GAZSNABTRANZIT, AO
MOLDOVAGAZ, and the REPUBLIC OF
MOLDOVA,

               Defendants.

16 Civ. 4118 (LAP)
99 Civ. 11962 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are a number of motions relating to Plaintiff-Petitioner Gater Assets Limited's ("Plaintiff") attempt to enforce an arbitration award against Defendants AO Moldovagaz ("Moldovagaz") and the Republic of Moldova ("Republic") (collectively, "Defendants").

Moldovagaz had previously moved on grounds of lack of subject matter and personal jurisdiction to vacate a default judgment entered against it and moved to dismiss a separate proceeding in which Plaintiff sought to renew the same default judgment ("the renewal action"). In an order dated September 30, 2018, this Court denied Moldovagaz's motions, although it reserved judgment on the question of personal jurisdiction (Order Denying Motion To Dismiss ("September Order"), dated Sept. 30, 2018 [dkt. no. 108], at 70). For the reasons discussed below, the Court now holds that Moldovagaz is an alter

1

ego of the Republic and therefore is barred from raising any Fifth Amendment due process objections to personal jurisdiction.

Separately, the month before this Court's September order, the Republic appeared and moved to vacate the default judgment against it (Motion To Vacate Default Judgment, dated Aug. 10, 2018 [dkt. no. 66 in 99-CV-11962[1]], at 1) and dismiss the renewal action (Motion To Dismiss Renewal Complaint For Lack Of Subject Matter Jurisdiction Under The FSIA And For Improper Venue, dated Aug. 10, 2018 [dkt. no. 101], at 1) on the grounds of subject matter jurisdiction and improper venue. For the reasons discussed below, both motions are denied.

I.    Background

Two sets of facts are necessary for determining the instant motions - issues regarding the nature of Moldovagaz and issues relating to the Republic and the underlying arbitration.

a. Moldovagaz Background

The energy of Moldova is supplied from Russia with natural gas. (Defendant Republic Of Moldova's Consolidated Memorandum Of Law In Further Support Of Its Motion To Dismiss The Renewal Complaint And Vacate The Default Judgment And In Opposition To Plaintiff's Supplemental Briefing On Alter Ego ("Republic Mem."), dated Feb. 20, 2019 [dkt. no. 129], at 14). Following

---

[1] All docket references are to the renewal action, 16-CV-4118, unless otherwise stated.

its secession from the Soviet Union, Moldova began incurring debt for gas purchases to the Russian state energy company, Gazprom. The Republic's first formal scheme to pay back these debts was effected through an entity called Gazsnabtranzit, which operated gas distribution in Moldova. (Plaintiff-Assignee's Supplemental Memorandum Of Law In Opposition To Defendant AO Moldovagaz's And Defendant Republic Of Moldava's Motions To Vacate And Motions To Dismiss ("Pl. Mem."), dated Nov. 30, 2018 [dkt. no. 120], at 4). Gazprom agreed to accept a 50% stake in Gazsnabtranzit in satisfaction of then-outstanding debt. The Republic was obligated to cover Gazprom's share of the capitalization of Gazsnabtranzit and contributed part but not all of the property to do so.

Then in 1997, with the Republic's gas-related debts rising, Moldovagaz was created as a merger of Gazsnabtranzit and other Moldovan energy entities. As stated in the corporate charter, Moldovagaz was formed for the "reduction of indebtedness" as well as "to provide consumers of the Republic Moldova . . . natural gas and the reliable transit thereof." Moldovan law prescribes that Moldovagaz is the vehicle through which the Ministry of the Economy provides energy to the citizenry. (Id. at 7).

Like its arrangement with Gazprom vis-à-vis Gazsnabtranzit, the Republic was obligated to contribute assets to Moldovagaz.

The Republic contributed assets to Moldovagaz, which were held
by the entities that were merged to create Moldovagaz.  However,
when the Republic contributed those assets, these entities owed
408,740,000 U.S. dollars in debt to Gazprom.  (Id. at 6).  In
July 1999, the Republic paid some of Moldovagaz's debt.  (Id. at
11).  The entity's total debt to Russia as of December 31, 2017
is over $6.7 billion.

Moldovagaz is a joint stock company and was formed in an
agreement among its three main shareholders, Gazprom, the
Republic, and the Moldovan territory Transnistria.  The Republic
holds 35.33% of Moldovagaz's shares, Gazprom holds 50% plus one
shares of preferred voting stock that allows it to cast a tie-
breaking vote, and Transnistria holds 13.44%.

Moldovagaz's organizational structure is divided in four:
the General Meeting of Shareholders, the Supervisory Council,
the Management Council ("the Board"), and the Internal Audit
Commission.  The General Meeting elects members of the
Supervisory Council and the Internal Audit Commission.
(Republic Mem. at 18-19).  The General Meeting requires a 90%
majority vote to take most decisions.  The Supervisory Council
consists of six members, two of whom are nominated by the
Republic.  The Board is composed of nine members appointed by
the Supervisory Council.  Decisions of the Board require the
support of seven members.

4

High-ranking Moldovan government officials have been the chairmen of Moldovagaz in the past. Moldova's state representative has the power to submit a "substantiated demand concerning repeal of [any] decision" that may prejudice the interests of the Republic. The Court has previously characterized such a power as "a state-controlled check on the prerogative of the majority vote regarding corporate matters." (September Order at 34).

With respect to Transnistria, no officials from that region serve on the Board. Moldovagaz is required to pay for gas supplied to its subsidiary in Transnistria to provide gas for the region.

The degree to which the Republic controls Moldovagaz's various agreements is addressed below, but for now it will suffice to say that the Republic's agreements with Russia and Gazprom govern many of the economic forces that impact Moldovagaz. For instance, the 2001 Moldova-Russia Agreement established the price that Moldovagaz pays Gazprom, and the 2007 Moldovagaz-Gazprom agreement serves a similar function and was negotiated by the Republic's Prime Minister and First Vice Premier. (Pl Mem. at 10).

b. The Republic Background

The background surrounding the arbitral award giving rise to the default judgment and renewal action was detailed in the

Court's September Order. (September Order at 2-11). To situate
the discussion, a brief summary follows.

On December 30, 1996, Gazsnabtranzit entered into Contract
No. 1 (GM-97) with Gazprom ("the Underlying Contract"). (Id. at
2). The Underlying Contract contained an arbitration clause.
(Id. at 4). On the terms of the agreement, Gazprom would sell
gas to Gazsnabtranzit, which would then deliver the gas to
customers in Moldova. (Id. at 2). Gazprom insured itself
against the risk that Gazsnabtranzit would consume gas in excess
of its quarterly allocation. (Id. at 3). That risk was
ultimately insured by Lloyds Underwriters (I.C. Agnew and Others
Lloyds Syndicate 672) ("Lloyds"). (Id.) When the risk came to
fruition, Lloyds became subrogated to the rights of Gazprom in
the Underlying contract. (Id. at 3-4). Lloyds commenced
arbitration proceedings against Gazsnabtranzit and on November
12, 1998, Lloyds secured an arbitration award of $8,548,965 (the
"Arbitration Award" or "Arbitral Award"). (Id. at 4) The
aforementioned reorganization of Gazsnabtranzit into Moldovagaz
took place shortly prior to the Arbitration Award.

   II.  Legal Standards

        a. Moldovagaz's Personal Jurisdiction Claim

   As the Court previously noted, this is a unique situation
where each side bears some burden. Moldovagaz bears the burden
of proof on the personal jurisdiction issue it raises in its

Rule 60(b)(4) motion to vacate the 2000 Judgment, while Gater

bears the burden of proving personal jurisdiction on

Moldovagaz's Rule 12(b)(2) motion to dismiss for lack of

personal jurisdiction. (Id. at 59). As discussed below, the

Court must determine whether Moldovagaz is an alter ego of the

Republic. If it is, then Moldovagaz has no Fifth Amendment due

process claim with respect to personal jurisdiction. Generally

speaking, Plaintiff would have the burden of proving alter ego.

Hester Int'l Corp. v. Fed. Republic of Nigeria, 879 F.2d 170,

176 (5th Cir. 1989); Baglab, Ltd. v. Johnson Matthey Bankers,

Ltd., 665 F.Supp. 289, 294 (S.D.N.Y. 1987). Given the unique

procedural posture where each side bears the burden in the

different actions, the Court will proceed without invoking

burdens of proof in either action. Plaintiff would prevail

regardless of whether or not it bore the burden.

     b. Subject Matter Jurisdiction Over the Republic

     The Foreign Sovereign Immunities Act (FSIA) is the "sole

basis" for obtaining jurisdiction over foreign sovereigns in

American courts. Argentine Republic v. Amerada Hess Shipping

Corp., 488 U.S. 428, 434 (1989). "Once the defendant presents

prima facie evidence that it is a foreign sovereign, the burden

falls on the plaintiff to establish by a preponderance of the

evidence that an exception under the FSIA permits jurisdiction

over the foreign sovereign." Swarna v. Al-Awadi, 622 F.3d 123, 143 (2d Cir. 2010).

Jurisdictional questions under the FSIA are determined under federal law. Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"), 313 F.3d 70, 85 (2d Cir. 2002). This Court had previously applied U.S. federal law in interpreting the underlying arbitration and its relevance to the FSIA and will do so here as well. (September Order at 47-48). As Plaintiff points out, the result would be the same under either Moldovan or Russian law. (Plaintiff's Second Supplemental Memorandum Of Law In Opposition To Defendant's Motions To Vacate And To Dismiss ("Pl. Sur. Rep."), dated April 11, 2019 [dkt. no. 140], at 1-2 n.2).

Rule 12(b)(1) permits dismissal of a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "[I]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." See Makarova, 201 F.3d at 113 (citing Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

Rule 60(b) of the Federal Rules of Civil Procedure allows the Court to grant relief from a final judgment, order, or proceeding on six distinct grounds, provided the motion is timely made. The Republic moves for vacatur of the 2000 Judgment under Rule 60(b), which permits a court to vacate a final judgment upon a showing of, inter alia, "mistake, inadvertence, surprise, or excusable neglect," a void judgment, or "any other reason that justifies relief." Fed. R. Civ. P. 60(b). Relief under Rule 60(b) "is addressed to the sound discretion of the district court." State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 166 (2d Cir. 2004) (quoting SEC v. McNulty, 137 F.3d 732, 738 (2d Cir. 1998)).

"Courts generally require that the evidence in support of the Rule 60(b) motion be 'highly convincing, that a party show good cause for the failure to act sooner, and that no undue hardship be imposed on other parties.'" Ritchie Capital Mgmt., LLC v. Coventry First LLC, 2016 WL 6952248, at *3 (S.D.N.Y. Nov. 28, 2016) (quoting Kotlicky v. U.S. Fid. & Guar. Co., 817 F.2d 6, 9 (2d Cir. 1987)). "The burden of proof is on the party seeking relief from judgment." United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 391 (2d Cir. 2001) (citing Paddington Partners v. Bouchard, 34 F.3d 1132, 1142 (2d Cir. 1994)).

"While some courts have stated that when either subject matter or personal jurisdiction is contested under Rule

60(b)(4), the burden of proof is properly placed on the party asserting that jurisdiction existed, . . . others hold that the burden shifts where the defendant was on notice of the original proceeding before the entry of default judgment, . . . ." Grady v. Grady, 2015 WL 5052663, at *1 (S.D.N.Y. Aug. 26, 2015) (internal quotation marks and citations omitted). Courts in this circuit have employed this burden-shifting mechanism where a plaintiff would experience "severe prejudice" solely because the defendant "has chosen to contest jurisdiction after judgment under Rule 60(b) rather than at the time of trial pursuant to Rule 12." Rohm & Haas Co. v. Aries, 103 F.R.D. 541, 544 (S.D.N.Y. 1984).

c. Improper Venue

"On a motion to dismiss for improper venue under Rule 12(b)(3), the burden of proof lies with the plaintiff to show that venue is proper." NextEngine Inc. v. NextEngine, Inc., 2019 WL 79019, at *1 (S.D.N.Y. Jan. 2, 2019) (quoting Cartier v. Micha, Inc., 2007 WL 1187188, at *2 (S.D.N.Y. Apr. 20, 2007); see also K.A. Holdings Ltd. of NY v. Chagaris, 2009 WL 10685159, at *5 (S.D.N.Y. Nov. 13, 2009) ("On a motion to dismiss for improper venue, the plaintiff has the burden of establishing that it has chosen a proper venue."). "Unless the court holds an evidentiary hearing, however, 'the plaintiff need only make a prima facie showing of venue.'" NextEngine Inc., 2019 WL 79019,

at *1 (citations omitted).  In determining whether a plaintiff has met this burden, courts must view "all facts in the light most favorable to the non-moving party." TradeComet.com LLC v. Google, Inc., 647 F.3d 472, 475 (2d Cir. 2011).

III. Discussion

a. Personal Jurisdiction Over Moldovagaz

The Court of Appeals has held that foreign states and their instrumentalities are not entitled to the Fifth Amendment's Due Process Clause protections with respect to personal jurisdiction. Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 399 (2d Cir. 2009). Personal jurisdiction over Moldovagaz turns, therefore, on whether it is a "foreign state."  As this Court has previously noted, the Supreme Court's framework in First National City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"), 462 U.S. 611 (1983) governs whether an entity is classified as a foreign state for the purposes of establishing personal jurisdiction, that is, whether the entity in question is an alter ego of a foreign state. Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 400 (2d Cir. 2009). Although Bancec was a case involving statutory interpretation of the FSIA with no mention of the text, history, or even ex post purpose of the Fifth Amendment, lower courts have used Bancec's non-constitutional federal common law framework to decide

11

questions of constitutional law.  See, e.g., Frontera, 582 F.3d
at 400; TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d
296, 301 (D.C. Cir. 2005).  Commentators have questioned the
rationale of both denying due process protections to foreign
states as well as using a rule untethered to the text of the
Constitution to guide constitutional analysis.[2]  The rationale of
the Court of Appeals in Frontera was that because U.S. States
are not considered "persons" protected by the Fifth Amendment,
then neither should foreign states.  582 F.3d 393, 399; Cf.
South Carolina v. Katzenbach, 383 U.S. 301, 323-24 (1966)
(holding that the Voting Rights Act's preclearance requirement
was a constitutional exercise of congressional power under the
remedial powers of the Fifteenth Amendment, rejecting a Fifth
Amendment due process challenge by South Carolina).

As a logical matter this is a doubtful proposition because
it would mean that granting due process protections to foreign
private corporations (or even non-alter ego state
instrumentalities) would elevate those entities above U.S.
States.  More importantly, however, as a constitutional matter,
there is much evidence to believe that at the time of the

_____

[2] "The Bancec test has been constitutionalized by the lower
courts with no analysis of why common law corporate and public
international law principles should govern the due process
issue."  Ingrid B. Wuerth, The Due Process and Other
Constitutional Rights of Foreign Nations, Fordham L. Rev. at 16
(forthcoming 2019).

framing, foreign sovereigns and entities were considered "persons" subject to appropriate process. For instance, a 1799 opinion of the U.S. Attorney General explained, "One of the most essential rights in the hands of the sovereign, is the judiciary power. It extends indiscriminately to all who are in the territory, and the sovereign only is the source of it; but it must be remembered that there are persons whose extraterritoriality exempts them from this jurisdiction, such as foreign princes and their ministers, with their retinue." 1 U.S. Op. Att'y. Gen. 87, 88 (1799); see generally Ingrid B. Wuerth, The Due Process and Other Constitutional Rights of Foreign Nations, Fordham L. Rev. at 39-45 (forthcoming 2019) (compiling historical sources to demonstrate that foreign sovereigns were considered "persons" under the Fifth Amendment).

Nevertheless, this Court must apply Bancec. Bancec established a presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." 462 U.S. at 626-27, 629, 632. This presumption can be overcome to establish an alter ego relationship if "(1) the instrumentality is so extensively controlled by its owner that a relationship of principal and agent is created; or (2) the recognition of an instrumentality's separate legal status would work a fraud or injustice." EM Ltd. v. Banco Cent. De La Republica Argentina,

13

800 F.3d 78, 90 (2d Cir. 2015). These two prongs are referred to as the extensive control and fraud or injustice prongs. Either one may be used to prove alter ego status. Id. at 91, 95.

Additionally, the "[d]etermination of who is and is not an agent of whom will be in great part factual, and the fact-finding should be explicit." Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 448 (D.C. Cir. 1990) (internal quotation marks and citations omitted).

Perhaps because it is not rooted in the text of the Constitution, the extensive control prong has not been articulated as a bright-line rule.[3] The Supreme Court was clear in Bancec that it was not "announc[ing] [a] mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded." 462 U.S. at 633. Instead, the Court of Appeals has listed a number of factors to be considered in a "fact-intensive" inquiry. EM Ltd., 800 F.3d at 91. These factors ask whether the sovereign nation, "(1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the

---

[3] On the virtue of rules see Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. CHI. L. REV. 1175 (1989).

independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." Id.

The purpose of the fraud or injustice prong is to "prevent foreign states from avoiding their obligations by engaging in abuses of corporate form." Id. at 95. "The common thread in [cases finding a fraud or injustice] is that the sovereign states at issue abused the corporate form." Id. While a preference for repaying one set of creditors over another does not constitute a fraud or injustice, the Court of Appeals has pointed to "frustrat[ing] the collection efforts of creditors" and treating the entity as a "sham" to hide assets as a showing of fraud or injustice. Id. at 96.

Given the open-ended directive of the Court of Appeals in EM Ltd., the Court's analysis proceeds in three steps. First the Court will evaluate each of the five EM Ltd. factors to determine extensive control, then it will evaluate the fraud or injustice prong, and then it will make an overall "totality of circumstances" determination. Cf. Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, 333 F. Supp. 3d 380, 411 (D. Del. 2018), aff'd and remanded, 932 F.3d 126 (3d Cir. 2019).

i. Extensive Control

1. The Republic's Use of Moldovagaz's Property

Plaintiff asserts that the Republic controls Moldovagaz's balance sheet through the influence it exerts over its revenues. The Republic has controlled the entity's revenues by "determining the amounts Moldovagaz pays for gas, the amounts it receives for transmitting gas, and the amounts Moldovagaz can charge consumers for gas." (Pl. Mem. at 21); (Notice Of Filing Of Expert Report Of Professor William E. Butler ("Butler Nov. 2018 Report"), dated Nov. 30, 2018 [dkt. no. 119], Ex. 24). For instance, Moldova's Prime Minister personally directed the entity to issue a refund to consumers following a rate reduction. (Butler Nov. 2018 Report Ex. 9 at 2). Recently a court in this district, in making an alter ego finding, found relevant the "influence" that the leadership of a country has on the decision making of the entity. Esso Exploration and Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp., No. 14 Civ. 8445, at 12 (S.D.N.Y. Sept. 4, 2019).

The Republic also appoints a "representative of the State" in managing Moldovagaz. (Butler Nov. 2018 Report at 12). According to a decree from the Government of Moldova, the representative of state shall "be obliged to agree in writing . . . with regard to the following questions: nominating candidacies to the management organs . . . making changes and

16

additions to [Moldovagaz's] constitutive documents . . .
conclusion of transactions, the volume of which exceeds 25% of
the assets of [Moldovagaz] . . . emission of obligations and
obtaining credits . . .." (Id. at 13).

The Republic also sets specific priorities for Moldovagaz
that show just how granular the day-to-day control is. A
striking example of such priority setting is Decree 685 which,
in relevant part, says, "the Ministry of Economy [of the
Republic] shall . . . facilitate the insertion in the investment
program of AO 'Moldovagaz' for 2014 and 2015 provisions
concerning investments necessary for the modernization of the
compressor station 'Dracia' and for the transfer of a segment of
the main gas pipeline Kishinev-Rybnitsa, 1.5 kilometers in
length, located in the avalanche zone near the rural village
Bunets, Kishinev municipality, in order to ensure the supply of
natural gas from alternative sources." (Butler Nov. 2018 Report
Ex. 15 at 1). This clearly demonstrates an interest in and
active control over the day-to-day activities of Moldovagaz.
Decisions over specific segments of pipeline, only 1.5
kilometers long, is certainly in the wheelhouse of day-to-day
decision making and not high-level corporate governance or
national energy policy.

In addition to the assets of the entity, the Republic also
exerts control over the debts of the entity. The Republic has

said that it – and not Moldovagaz – has paid some of the Republic's debts to Gazprom, and Gazprom has endorsed this language. (Pl. Mem. at 23).

Defendants' attempts to analogize to NML Capital, Ltd. v. The Republic of Argentina, 2011 WL 524433 (S.D.N.Y. Feb. 15, 2011) in response are unavailing. Defendants argue that control over Moldovagaz's revenues and debts is a form of legitimate sovereign power where any control is incidental to a sovereign's legitimate decision to subsidize its citizenry with a supply of natural gas. Id. at *7. But as one district court has essentially put it – not all national energy companies are created equal. Cf. Crystallex, 333 F. Supp. 3d at 409. The supply of natural gas to the Republic's citizens was not the sole purpose of Moldovagaz. Rather the entity was constructed as a means of reorganizing debts owed to a third-party. This is not mere energy policy and regulation as in NML Capital, but a form of government financial engineering. Furthermore, in NML Capital, there were only allegations of "broad control." NML Capital, 2011 WL 524433, at *7. As will be demonstrated below, and on the specific pipeline dictates above contained in Decree 685, there was more control here than simply a setting of national priorities. The nation may have benefitted in some way from a re-prioritization of creditors, but this seems to the Court categorically different from effecting energy policy.

The Republic argues that if a wholly-owned subsidiary is
not an alter ego, as the Court of Appeals held in NML Capital
then it follows a minority stake cannot create an alter ego.  As
a matter of both law and fact this is incorrect.  As a matter of
law, a court's finding that a wholly-owned subsidiary was not an
alter ego does not mean that a wholly-owned subsidiary can not
be an alter ego – Defendants' argument assumes that minority
ownership stakes, even if active, cannot exert as much control
as passive majority stakes.  This is not a correct assumption.
Additionally, as a matter of fact in this case, the relationship
that the Republic had to Moldovagaz was qualitatively different
from the relationship between Argentina and the wholly-owned
subsidiary in NML Capital because of the purposes of the
formation of Moldovagaz, which was not merely to provide energy.
As the court put it in Crystallex, finding that not all energy
companies are created equal, "[j]ust because PDVSA shares this
feature (and perhaps others) with 'typical' national oil
companies does not, however, deprive this feature of all
evidentiary value in assessing whether Venezuela exercises
extensive control over PDVSA." Crystallex, 333 F. Supp. 3d at
409.  Argentina's national gas company is more "typical" than
that of the Republic or Venezuela.

It is worth observing a helpful rule of thumb for future
courts in dealing with these cases.  Although certainly not

dispositive, the Court cannot help but observe a trend in alter
ego jurisprudence: courts are more likely to make an alter ego
finding with energy companies, especially where the country's
name or some derivation thereof appears in the corporation's
name; however, there is no similar trend with respect to non-
energy companies.[4]

---

[4] For national energy companies, see, e.g., Bridas S.A.P.I.C. v.
Gov't of Turkmenistan, 447 F.3d 411 (5th Cir. 2006) (finding
that Turkmenneft was an alter ego of Turkmenistan); Esso
Exploration and Prod. Crystallex Int'l Corp. v. Bolivarian
Republic of Venezuela, 333 F. Supp. 3d 380 (D. Del. 2018)
(finding that Petróleos de Venezuela, S.A. was an alter ego of
the Bolivarian Republic of Venezuela); Kensington Int'l Ltd. V.
Republic of Congo, 2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007)
(finding that Société Nationale des Petroles du Congo was an
alter ego of the Republic of Congo; Nigeria Ltd. V. Nigerian
Nat'l Petroleum Corp., 2019 WL 4194193 (S.D.N.Y. Sept. 4, 2019)
(finding that Nigerian National Petroleum Corporation was an
alter ego of Nigeria); U.S Fid. & Guar. Co. v. Petroleo
Brasileiro, 2001 WL 300735 (S.D.N.Y. Mar. 27, 2001) (finding
that Petrobras Brasileiro S.A. was an alter ego of Brazil); but
see NML Capital, Ltd. v. The Republic of Argentina, 2011 WL
524433 (S.D.N.Y. Feb. 15, 2011) (finding that Energia Argentina
S.A. was not an alter ego of the Republic of Argentina). For
non-energy companies, see, e.g., EM Ltd. v. Banco Cent. De La
Republica Argentina, 800 F.3d 78 (2d Cir. 2015) (finding that
Banco Central de la República Argentina was not an alter ego of
the Republic of Argentina); Zappia Middle E. Const. Co. v.
Emirate of Abu Dhabi, 215 F.3d 247 (2d Cir. 2000) (finding that
the Abu Dhabi Commercial Bank was not an alter ego of Emirate
of Abu Dhabi); De Letelier v. Republic of Chile, 748 F.2d 790,
792 (2d Cir. 1984) (finding that Linea Aerea Nacional-Chile was
not an alter ego of the Republic of Chile); First Nat. City
Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611
(1983) (holding Banco Para El Comercio Exterior de Cuba was an
alter ego of the Government of the Republic of Cuba).

2. The Republic Ignores Moldovagaz's Separate
Status and Corporate Formalities

Plaintiff argues that both the words and actions of the
Republic demonstrate that it ignores the separate status of
Moldovagaz.  On words, Plaintiff points to the Moldovan
president who has referred to the entity's debt as his country's
debt.  In a news article, Moldovan President Igor Dodon said "We
have some ideas how to get out of this situation [referring to
indebtedness] . . . We must understand that this debt [owed to
Gazprom] – over $6.5 billion – is the total debt of Moldova."
(Declaration Of Michael H. Mcginley ("McGinley Decl."), dated
Dec. 1, 2018 [dkt. no. 121], Ex. 22 at 1).  On actions, the
price-setting of the Republic is a fundamental determinant of
Moldovagaz's profits.  The Republic's citation to what it deems
a misstatement of Moldovan law actually furthers this point.
(Republic Mem. 29-30).  As a matter of Moldovan law, it may be
the case that Moldovagaz "has full ownership rights to its own
property."  (Id. at 30).  This is a corporate formality that the
Republic ignores when it uses Moldovagaz as a vehicle not only
for supplying energy to the citizenry but for repaying debts
owed by the Republic.  Dodon's comments evince his understanding
of the state's relationship to Moldovagaz which is that it is a
part of the state and central to its finances.  Although not

dispositive, this factor certainly cuts in the direction of an alter ego determination.

### 3. The Republic's Deprivation of Independence from Close Political Control

Plaintiff argues that the composition of Moldovagaz's management organs demonstrates that it is deprived of operational and managerial independence. As a preliminary matter, it is worth noting that the Republic explicitly concedes this point. It says that "Gazprom (not the Republic) exercises decisive influence over Moldovagaz's corporate organs such that the Republic plainly lacks the ability to 'manipulate' Moldovagaz's finances as [Plaintiff] claims." (Defendant Republic Of Moldova's Response To Plaintiff's Second Supplemental Memorandum Of Law And In Further Support Of Its Motions To Vacate And To Dismiss ("Republic Rep."), dated May 23, 2019 [dkt. no. 147], at 8). This hardly bolsters Defendants' case that Moldovagaz is anything other than the plaything of two Eastern European sovereigns. The Republic does not disagree that Moldovagaz is deprived of independence, it simply disagrees over who is doing the depriving.

For a number of reasons, the Court finds that it is Moldova that is exercising control over Moldovagaz. To begin, there are a number of Moldovan officials who are represented in the entity. The Supervisory Council includes the State Secretary of

22

the Moldovan Ministry of the Economy and Infrastructure, as well as the Department Head of the Ministry of the Economy and Infrastructure. The Audit Committee includes Moldovan government employees, including the aforementioned Department Head and the Main Section Consultant for the Ministry of the Economy and Infrastructure. While the law is clear in rejecting the proposition that "the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the Bancec presumption," courts have found that appointing board members is a factor. EM Ltd., 800 F.3d at 92; Crystallex, 333 F. Supp. 3d at 402. The most recent Chairman of Moldovagaz was a Moldovan government official who is now Moldova's Director of Security and Intelligence. (Pl. Mem. at 27). The Board has a residual power that includes "all questions of the direction of currency activity of [Moldovagaz], except for those relegated to the competence of the Meeting and the Council." (Butler Nov. 2018 Report Ex. 3 Art. 48(3)). Plaintiff's expert explains, "[t]his includes the right and power to enter into transactions of all types, make personnel decisions, and direct the day-to-day activity of [Moldovagaz]." (Id. at 11).

In addition to managerial direction, the Republic has entered into external contracts that bind Moldovagaz without a signatory from Moldovagaz. (Pl. Mem. at 28). This is

particularly relevant to this prong because it demonstrates that Moldovagaz does not have the independence to make business decisions that have an effect its own bottom line.

Defendants counter that Gazprom is the real actor that exerts influence over the day-to-day actions of Moldovagaz. Plaintiff concedes that Gazprom occupies more seats on the boards by virtue of its greater ownership stake. This, however, is "natural for a creditor within a joint venture," and by looking past the formalities of the setup it becomes clear who is in day-to-day charge.

First, even assuming that Gazprom could extensively control the entity, it has not been proved that it does exert influence. Indeed, Defendants' case is belied by their own admission that the Republic has never invoked what Plaintiff calls its "superpower veto." (Republic Mem. at 29). This Court has also previously characterized the "superpower veto" as "a state-controlled check on the prerogative of the majority vote concerning corporate matters" and allows the Republic to "exercise supervision over Moldovagaz." (September Order at 34). The Republic's interests are being served with the current makeup of the board and the current management.

Additionally, undermining the assertion that Gazprom is the entity in charge is the fact that it must abstain from important

votes where there is a conflict of interest, further discussed below.

Defendants say that "the Chairman's responsibilities and powers are limited to executing the policies and decisions established by the Supervisory Council and/or the collective Board." (Republic Mem. at 29). But it is not shown that the policies and decisions of the Supervisory Council are at odds with the Republic's wishes. Indeed, the whole purpose of the joint venture between the Republic and Gazprom was an agreed-upon solution to both debt restructuring and energy provision. In executing this policy, the Chairman is executing the desire of the Republic.

On more managerial decisions, the Republic also exercises control. For instance, the Prime Minister forced Moldovagaz to provide a refund to customers. (Butler Nov. 2018 Report Ex. 9 at 2). This was not a business decision, but rather a political one.

Defendants also say that finding a minority stakeholder as an alter ego is unprecedented. The fact is that this area of law is not so developed such that there is an established and exhaustive list of factors where if one of them is missing, there can be no alter ego status.

4. Moldovagaz's Need for Approval from

Political Actors

Beyond arguing that the Moldovagaz must seek approval from political actors in the Moldovan government, Plaintiff argues that some of Moldovagaz's most important business decisions are made directly by the Republic. The Republic is the chief negotiator for Moldovagaz and decides issues like the interest rates governing the entity's debt, the prices the entity pays for its sole product, and the price it charges its consumers. The Republic has pledged its resources to satisfy Moldovagaz's obligations in certain events. (Pl. Mem. at 30).

The Republic has also issued a number of decrees that direct Moldovagaz to make very granular business decisions. For instance, the Republic issued a decree setting forth the details of the entity's obligations, including the documents necessary, for a maintenance relationship between a pipeline's managers and Moldovagaz. (Id. at 31). Additionally, legislation from the Republic established a Special Commission with the power to review any one of Moldovagaz's financial transactions and documents, regardless of size. (Butler Nov. 2019 Report at Ex. 13).

The Republic counters that its state-to-state agreements with Russia and agreements with Gazprom are not evidence of day-to-day control. The Republic gives two reasons why this is the

26

case.  First it says that "these were agreements between two
states . . . the Republic was not unilaterally dictating
anything."  (Republic Mem. at 35).  Although it is true that
there was no unilateral diktat from the Republic vis-à-vis
Russia or Gazprom, there was a mandate vis-à-vis Moldovagaz – a
decision was made that directly affected Moldovagaz that
Moldovagaz did not participate in.  The Third Circuit found this
factor particularly relevant when it pointed to the bondholder
disclosures of the Venezuelan energy company which stated, "[W]e
cannot assure you that [Venezuela] will not, in the future,
impose further material commitments upon us or intervene in our
commercial affairs in a manner that will adversely affect our
operations, cash flow and financial results."  Crystallex Int'l
Corp. v. Bolivarian Republic of Venezuela, 932 F.3d 126, 146 (3d
Cir. 2019).  This is certainly true here where all parties
concede that the unilateral decisions of the Republic, such as
the terms of the energy agreements with Russia and Gazprom, have
a dispositive effect on Moldovagaz.

Indeed in U.S. Fid. & Guar. Co. v. Braspetro Oil Servs.
Co., the Court of Appeals affirmed the district court's finding
that a third party's failure to distinguish between the entity
and the sovereign was relevant.  1999 WL 307666, at *10
(S.D.N.Y. May 17, 1999), aff'd, 199 F.3d 94 (2d Cir. 1999).
Here, in negotiating, neither Gazprom nor Russia views

Moldovagaz as its negotiating partner, but rather as a vehicle
of the Moldovan government to effect whatever agreement is made.

The second reason given by the Republic for why its state-
to-state agreements with Russia and Gazprom do not evidence day-
to-day control is that while the treaties establish the
parameters for trade, the treaties acknowledge "amounts and
conditions for the sale of natural gas shall be determined on
the basis of annual contracts" between Gazprom and Moldovagaz.
(Republic Mem. at 36).

The Republic undermines its case, however, when it points
to the fact that the Supervisory Board must approve the supply
agreements.  The Republic acknowledges that "the supply
agreements can only be approved by consensus of both
shareholders (Gazprom and the Republic) in accordance with
ordinary corporate formalities."  (Id.)  It is not a defense to
the charge that the Republic controls the entity that the
Republic is one of the parties that gets to rubber stamp its own
agreement directing the entity to act in a certain way.  It is
possible that Gazprom's ability to object on the Supervisory
Board could mean that the Supervisory Board is not simply a
rubber stamp, but no evidence has been proffered to that effect,
and it would undermine the very scheme that is in place here.
What is going on is the Republic and Russia are negotiating, and

their national energy companies simply instantiate the sovereigns' agreement.

Finally, as mentioned above, Gazprom must recuse itself from any votes involving Moldovagaz's contract with it.

The Republic also raises a slippery slope argument where "any natural gas company in Europe is an alter ego of its government who participated in negotiations and ratified a bilateral treaty with the Russian Federation." (Defendant Moldovagaz' Supplemental Memorandum Of Law In Further Support Of Moldovagaz' Motion To Vacate And Motion To Dismiss ("Moldovagaz Mem."), dated Feb. 20, 2019 [dkt. no. 127], at 9). There is a clear limiting principle that would prevent all sovereigns from being treated as alter egos with their instrumentalities, namely the extensive control and fraud or injustice prongs. Not all energy companies are formed to extinguish debts of their sovereign and not all energy companies have as shareholders their sovereigns. Parts of the world still adhere to principles of free enterprise and capitalism.

5. The Republic Caused Moldovagaz to Act on

Behalf of the Republic

The difficulty with this prong is that a shareholder often causes a corporation to act on the shareholder's behalf. Plaintiff argues that Moldovagaz's creation, which was explicitly for the national purposes of both energy and debt

restructuring, is evidence of alter ego status. The entity has acted in numerous times in a way not consistent with how a purely commercial entity would act, for instance in selling to customers who were not paying for its product and by selling its product below market rates.

Defendants cast the evolution of Moldovagaz as a genuine example of privatization. (Id. at 9-10). They say that the entity did not inherit any state powers, its shares trade freely on the Stock Exchange of Moldova, and that there have been more than 90 lawsuits against the Republic from Moldovagaz. (Id. at 9-12); (Notice Of Filing Of Expert Report Of Valentin Barba ("Barba Feb. 2019 Report"), dated Feb. 20, 2019 [dkt. no. 128], at 10).

On the first point, the entire alter ego inquiry analysis will often look past corporate formalities, and these include powers that the entity technically has or does not have. Here, as a monopolist, Moldovagaz has state-granted powers, regardless of whether they are formally recognized as state powers in themselves.

On the stock market, Defendants' expert notes that from 1999 to 2019 - a twenty-year period - only 95 transactions were registered to change the ownership rights to the shares of Moldovagaz as a result of share transactions on the Stock Exchange of Moldova. (Barba Feb. 2019 Report at 11). This is

hardly an open market and amounts to fewer than five transactions on average each year. Furthermore, the number of shares that trade is so small compared with the ownership stakes of the Republic and Gazprom that it cannot be said the entity is somehow beholden to public shareholders or capitalist price discovery is at work here. In addition, as indicated by the confirmation of the number of transactions, some results from "inheritance transactions," so the actual number of real buy/sell trades is even lower. (Id. Ex. 8 at 1).

The final point about the actions initiated by Moldovagaz against the Republic is worth addressing in depth because it raises a potentially dispositive counter to an alter ego finding. The more the interests of the ego and its alter diverge and become adversarial towards one another, the less likely it is that such an alter ego relationship exists. Here, Defendants point to the fact that the Chairman of Moldovagaz's Management Board, Mr. Gusev, signed two complaints against the Republic to the Director of the Secretariat of the Energy Community of the European Union. (Moldovagaz Mem. at 13).

Plaintiff makes two observations. The first is that in the petition Mr. Gusev wrote the existing price methodology "does not provide for profit formation, [and] that JSC 'Moldovagaz' is obligated to work non-profit." (Pl. Sur. Rep. at 8). Secondly, this petition cost Mr. Gusev not only his job, but raised the

specter of imprisonment as he "became the target of a politically-motivated criminal investigation" forcing him to resign and leave the country. (Id.)

Defendants counter by saying that Mr. Gusev continued to hold his position for a year. This does not refute the charge that he was forced to leave the country. The Third Circuit found that firing employees for not toeing the party line, as Mr. Gusev apparently did not with respect to tariff rates, was a relevant factor. Crystallex, 932 F.3d at 148.

More problematic, however, is the admission that "it did not make sense for the state to [prosecute] Mr. Gusev criminally in order to exert influence on AO Moldovagaz . . . since such actions did not depend on Mister Gusev." Defendant Moldovagaz' Second Supplemental Memorandum Of Law In Further Support Of Moldovagaz' Motion To Vacate And Motion To Dismiss ("Moldovagaz Rep."), dated May 23, 2019 [dkt. no. 145], at 2). Defendants cannot have it both ways – either Mr. Gusev was an actor with actual power whose decisions to challenge the Republic demonstrate independence or nothing depended on Mr. Gusev.

In using three years of profitability to counter the charge that the company is perpetually operating as a sovereign non-profit, Defendants point to changes in tariff regulations. (Moldovagaz Rep. at 2). The company did not become profitable for some endogenous reason but instead as a result of a decision

made by the Republic.  While this fact is not necessarily decisive, as a regulator does have a role to play in setting rates, it certainly does not lend support to the idea that Moldovagaz exists as a profit-making entity on its own.

### ii.  Fraud or Injustice

With respect to the fraud or injustice prong, Plaintiff's argument hinges on Defendants' attempts to evade the arbitral award judgment, as well as Moldovagaz's persistent undercapitalization.

Plaintiff characterizes the 2000 Moldovan proceedings following the arbitral award as "highly irregular."  (Pl. Mem. at 35).  Without adopting that language, Defendants concede that there was a mistake made by the Moldovan Court that led to the decision to render the arbitral award unenforceable.  (Republic Mem. at 38 n.23).  Defendants argue, however, that "the alleged injustice resulted from a decision of the Moldovan court, not the abuse of Moldovagaz's corporate form."  (Id. at 38). Defendants cite to the Fifth Circuit for the proposition that even if a sovereign act constitutes a wrong, for the purposes of the alter ego test, the only wrongs that count are those "based on misuse of the corporate organizational form."  Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 447 F.3d 411, 417 (5th Cir. 2006).

The Court is not persuaded by this analysis. First, in Bridas the Fifth Circuit found a fraud or injustice had been effected based on "[t]he Government's manipulation of [the alter ego] to prevent [plaintiff] from recovering any substantial damage award." Id. There is no question in this case that the Republic and Moldovagaz want to prevent Plaintiff from collecting its arbitral award. The only question is whether they have manipulated Moldovagaz to do so. As a practical matter it is certainly the case that whatever corporate arrangements the Republic has with Moldovagaz, they have thus far worked to prevent Plaintiff from collecting its judgment. As in Bridas, the Republic's manipulation of Moldovagaz's corporate form has prevented Plaintiff from recovering.

Plaintiff points to Moldovagaz's chronic undercapitalization as evidence of this manipulation. With respect to this undercapitalization there is a disagreement between the parties as to amounts. Plaintiff's expert, for instance, challenges Defendants for providing no account of the Republic's non-cash contribution to Moldovagaz. (Notice Of Filing Of Expert Report Of Professor William E. Butler ("Butler Apr. 2019 Report"), dated Apr. 11, 2019 [dkt. no. 142], at 3). Regardless of the extent of the undercapitalization, Defendants make an important concession when they say that "the Republic has merely provided financial assistance by agreeing to repay

34

certain of Moldovagaz's debts to Gazprom, Moldovagaz's largest creditor, to ensure its ability to continue to supply natural gas to Moldova's citizens." (Republic Mem. at 37). As a sovereign, paying one's largest creditor may be a wise policy judgment, but it flies in the face of what Moldovagaz says when it writes that any undercapitalization is not due to any decision made by Moldova but instead a result of "chronic unfavorable market conditions, its inferior bargaining power in deals with the monopolistic Russian monster Gazprom, and constant inability of its customers to pay for the consumed gas." (Moldovagaz Mem. at 21). Defendants point to the fact that the undercapitalization is not as great as in other cases cited by Plaintiff, including Bridas. (Moldovagaz Rep. at 3). But this Court does not read the fraud or injustice prong to establish an absolute value of capitalization floor above which certain violations are acceptable.

In response to the decision to pay Gazprom instead of their judgment creditors, Defendants point to Moldovagaz's "strict compliance with its Charter and all applicable law." They wield this strict compliance as both a sword and shield, but the Court looks past formalities to divine what is clearly going on here: Defendants are reprioritizing their creditors. This may be the correct realpolitik calculation for a sovereign, but such a proposition finds no refuge in American courts of law which "do

35

equal right to the poor and to the rich." 28 U.S.C. § 453. That is why the court in Bridas did not hang its decision on the government of Turkmenistan's export ban, which could plausibly be characterized as an exercise of sovereign power. Rather the decision rested on what is happening here – an attempt to pay some creditors over others and use a reorganization to frustrate collection.

The record here demonstrates that it would work a fraud and injustice to allow Moldovagaz to hide behind its corporate form to reprioritize its debts with the effect that Plaintiff never gets paid on its judgment.

iii. Totality of Circumstances

There are a number of facts that do not fit neatly into the aforementioned categories but persuade the Court towards an alter ego determination.

With respect to the senior officers of Moldovagaz, Defendants' expert says that candidates for the entity's board were "mostly not civil servants." (Barba Feb. 2019 Report at 22). This is not true. Of the five names listed, Defendants' expert says that two were civil servants. (Id.) In fact, M.F. Lesnik, who was Moldovagaz's Chairman of the Board from 1999 to 2001 was previously the general director of State Concern Moldovagaz, which was then part of the Moldovan Department of Energy. (Declaration Of May Chiang ("Chiang Aff."), dated Apr.

11, 2019 [dkt. no. 141], Ex. 3 at 1). The majority of the names listed, therefore, were civil servants.

With respect to the Republic's relative power vis-à-vis Gazprom, it is clear that the Republic has a blocking power that gives it a tremendous amount of day-to-day control over crucial corporate activities of the company. As mentioned above, the entity was created to satisfy debt to Gazprom. Because Gazprom sits on the board of Moldovagaz, it is conflicted and must abstain from certain votes. For instance, in recently approving two transactions relating to the "delivery of natural gas to the Republic Moldova" and the "transit of natural gas on the territory of the Republic Moldova," it was required that representatives from Gazprom "leave the session when the question is considered." (Butler Apr. 2019 Report Ex. 2 at 2).

Defendants respond with three arguments. First, they say that the Gazprom votes count only in transactions where Gazprom is not a party. (Moldovagaz Rep. at 7). The agreements with Gazprom, however, are fundamental to the operation of Moldovagaz and the very reason for the existence of the entity. Gazprom's inability to participate in these votes is not insignificant. One can imagine that the only votes Gazprom can participate in are about the paint color of the walls in Maldovagaz headquarters.

Second, Defendants respond that all transactions with a conflict of interest are initially discussed, and Gazprom can participate. (Id.); (Barba May 2019 Report at 8). Mere participation, however, is not enough to ensure a decisive vote on vital agreements. If it is the case that Gazprom and the Republic agree on all pertinent matters, then it simply furthers the point that the Republic is able to exert its will and influence in a decisive manner that affects day-to-day operations of the business.

Defendants analogize to the "civilized corporate world" where such abstentions are commonplace. (Moldovagaz Rep. at 7). This may be true, but there is generally no need to make an alter ego determination in the "civilized corporate world." Further, Defendants have not demonstrated that such civilized corporate practices preclude day-to-day control.

Finally, Defendants argue that Gazprom's abstentions only occur at annual meetings and not on matters of day-to-day control. (Id.) This argument fails because while the annual meeting only occurs once a year, the important actions taken there (and executed throughout the year) certainly allow for an exertion of day-to-day control.

On the formality of transferring government functions, Defendants' expert argues that because Article 107 of the Moldovan Constitution lists the powers and functions of the

38

Moldovan government and the government has not "legally or actually transferred to Moldovagaz" any of those powers or functions, the Republic cannot be an alter ego. (Barba Feb. 2019 Report at 9-10). This argument is belied by the above analysis that demonstrates Moldovagaz's important role in executing energy and financial policies of the Republic.

Defendants' expert makes much of the fact that there is a presumption according to which "placed shares are considered as shares fully paid for by their first acquirers." (Notice Of Filing Of Expert Report Of Valentin Barba ("Barba May 2019 Report"), dated May 23, 2019 [dkt. no. 146], at 3). This presumption "does not need to be proved, since it results from the above mandatory provision of law." (Barba May 2019 Report at 4). Plaintiff's expert, in asserting that the entity was undercapitalized by the Republic, specifically points to the non-cash property, which was not independently assessed, and the actual of value of which is asserted to result in a negative capitalization. (Butler Apr. 2019 Report at 2). Defendants' expert points to reports of delivery of assets and registry of the real estate in response. (Barba May 2019 Report at 5).

Even if the Court were to adopt the presumption, it is clearly defeated here. Defendants' expert is able to at most show that Moldovagaz was capitalized to some extent by the Republic. In pointing to the lack of an independent valuation

of the non-cash property, Plaintiff's expert is not saying that
the entity was not capitalized at all, but that it was
undercapitalized.  Additionally, there was at least certainty as
to an initial undercapitalization because Decree 1212 of the
Parliament of Moldova dated July 31, 2000 indicates that the
capital contributions had not been made in full.  (Butler Apr.
2019 Report Ex. 1 at 1).  This defeats the presumption.
Further, had there been adequate capitalization, the Republic
should be able to demonstrate it other than by mere ipse dixit
as it does in its expert's report (Barba Feb. 2019 Report at 15)
– that it does not is telling.

Defendants' expert states, in a conclusory manner, that
"decisions [on alienation of Moldovagaz's property] were made
independently without any consent of the government."  (Barba
Feb. 2019 Report at 17).  As proof, the expert says that a
building was sold by the entity.  (Id.)  This hardly proves that
the action was done independently or without consent as it could
certainly be the case that the Republic neither objected to nor
would have objected to the sale.  The Court does not place undue
weight on the formal declarations of the charter which say
Moldovagaz "shall have the right to possess, use, and dispose of
this property autonomously. . ."  (Butler Nov. 2018 Report Ex. 3
at 4).  Defendants' expert adopts too narrow of a reading of
"independently."  Legislation and regulation circumscribe the

manner in which property may be disposed of. This is especially true when laws and regulations are written not with general applicability but instead are written specifically to direct certain actions to be taken by particular entities. Here, the Republic required Moldovagaz to lay certain segments of pipeline; the Republic also sets relevant tariffs for this monopolist. (Butler Nov. 2018 Report Ex. 15 at 1). While it may be argued that these are legislative functions, they also demonstrate a control over the entity in furtherance of the Republic's ends.

Furthermore, In sum, all parties recognize that Moldovagaz is not your mom-and-pop gas station. But the Republic recognizes it a little too whole-heartedly when it says "Gazprom (not the Republic) exercises decisive influence over Moldovagaz's corporate organs such that the Republic plainly lacks the ability to 'manipulate' Moldovagaz's finances as [Plaintiff] claims." (Republic Rep. at 8). This undermines much of the Republic's attempts at painting Moldovagaz as a privatized company that is seeking to turn a profit. Even the genesis of the entity, State Concern Moldovagaz, which was "privatized" in 1995, resulted in a situation where at least 80% of the company remained in state ownership.

Moldovagaz is not master in its own house. The Republic is correct in saying that it is "plain" that Moldovagaz does not

exercise decisive influence over itself; the Court simply parts ways with the Republic over who exercises that decisive influence. As noted above, it is the Republic that exercises decisive influence over Moldovagaz. The record firmly disproves Defendants' expert's characterization of the creation of Moldovagaz – that it was based on a will of the Republic to engage in "private entrepreneurial initiative." (Barba Feb. 2019 Report at 6). As also noted above, Moldovagaz was created to pay down part of the Republic's debt to Gazprom and to provide for Moldova's citizens' energy needs.

b. Subject Matter Jurisdiction Over the Republic

Section 1605 of the FSIA sets out enumerated exceptions to FSIA immunity, including any case:

> (6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

28 U.S.C. §§ 1605(a)(6) (emphasis added). Having concluded previously that the New York Convention is an "international agreement in force for the United States calling for the recognition and enforcement of arbitral awards" and that Moldovagaz was subject to the arbitral award exception (September Order at 51-52), the question before the Court is whether the agreement was "made by" the Republic. 28 U.S.C. §§ 1605(a)(6).

The Republic is a nonsignatory to the arbitration agreement. The Court of Appeals has recognized five theories for binding nonsignatories to arbitration agreements: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). The Court of Appeals has eschewed a "hybrid" approach and held "[a] nonsignatory may not be bound to arbitrate except as dictated by some accepted theory under agency or contract law." Id. at 780.

The Court has already made a determination that Moldovagaz is an alter ego of the Republic in the context of the Fifth Amendment due process claims of the Republic. Given that the Court of Appeals has explicitly not drawn a distinction between the statutory and constitutional tests in this context, the Court adopts the same alter ego determination to find that the

Republic as a nonsignatory can be bound to the arbitration agreement.

Veil piercing determinations "differ[] with the circumstances of each case," American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir.), cert. denied, 488 U.S. 852 (1988), and are fact specific. The inquiry articulated by the Court of Appeals in Thomson-CSF for veil-piercing is completely consistent with the alter ego inquiry laid out by the Court of Appeals in EM Ltd. 64 F.3d at 777-78. There is here an intermingling of corporate finances with respect to the debt assumption. (Pl. Mem. at 11-12). There is also an intermingling of directorships. The Department Head and State Secretary of the Ministry of the Economy and Infrastructure both sit on the Supervisory Council. To be sure, a sovereign is not a corporation, so there is no exact intermingling of directorships, but the principle here is certainly the same.

Independently, a direct benefit estoppel theory also provides a basis for finding that the Republic is bound to the arbitration agreement. "Where a company 'knowingly accept[s] the benefits' of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause." MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001). "The benefits must be direct—which is to say, flowing directly from the

44

agreement." Id. A benefit is indirect where "the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." Id.

Plaintiff points to the 1996-97 Moldova-Russia Trade Agreement ("Trade Agreement") as obligating the Republic to cause Moldovagaz's predecessor, Gazsnabtranzit, to enter the Underlying Contract that included the arbitration clause. (Pl. Sur. Rep. at 3). The benefit from causing Gazsnabtranzit to enter into the contract was a discharging of the obligations of the Trade Agreement.

The Republic counters that the Trade Agreement did not require the Republic to cause Gazsnabtranzit to enter into the contract, but rather to "instruct the relevant state bodies to prepare proposals." (McGinley Decl. Ex. 6 at 2). The Trade Agreement then says that the relevant "economic entities" will "conclude agreements with each other." (Id.)

The Court is not persuaded. The Republic's "instruct[ions]" were not suggestions but rather orders, and while it was an order to "prepare proposals," consummation of these proposals was contemplated by the terms of the Trade Agreement. The Republic would have the Court believe that Gazsnabtranzit, referred to as a "state bod[y]," was free to weigh the Underlying Contract as any private party would – that

45

it was purely fortunate happenstance that situation turned out exactly as the Republic bargained for. The Court is not convinced. These entities find their entire genesis in "instructions" from the Republic that would allow Gazsnabtranzit to discharge the Republic's obligations. It strains credulity to think the Republic would not get what it bargained for here.

The Republic says "[E]ven if the Underlying Contract in a general sense benefitted the Republic . . . any such benefit plainly cannot be deemed direct because the Republic did not exploit and thereby assume the Underlying Contract itself." (Republic Rep. at 4). The Court disagrees. There was an exploiting of the Underlying Contract here – it was specifically contemplated by the Trade Agreement and the benefit to the Republic, i.e. a discharging of its duties under the Trade Agreement, flowed directly from the Underlying Contract that contained the arbitration clause.

Two cases cited by Plaintiff and the Republic provide the grist for their casuistry: Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060 (2d Cir. 1993) and American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2d Cir. 1999) where the Court of Appeals found direct benefits to nonsignatories.

In Deloitte, a Norwegian affiliate of the umbrella Deloitte was a nonsignatory to an agreement that contained an arbitration

clause that governed the terms of use of a trade name.
Deloitte, 9 F.3d at 1064. The Court of Appeals held that the
affiliate was bound to the agreement because (i) the affiliate
"received the benefits secured for all [Deloitte] member firms"
pursuant to the agreement; (ii) "the parties clearly intended to
bind all [Deloitte] members under the [agreement]"; and (iii)
the agreement "expressly condition[ed] the continuing right of
[Deloitte] member firms to use the name 'Deloitte' on their
adherence to the terms of the [a]greement." Id.

In Tencara Shipyard, the owner of a yacht was a
nonsignatory to an agreement that contained an arbitration
clause between the shipbuilder and the entity that certified the
yacht. Tencara Shipyard, 170 F.3d at 351. The owner was
required to arbitrate because of the benefit it received from
the certification of the yacht. Id. at 353.

The Republic distinguishes the instant case on the grounds
that in Deloitte and Tencara Shipyard, "the parties resisting
arbitration derived a direct benefit from the contracts
containing the arbitration agreement." (Republic Rep. at 5).
Here, in contrast to the affiliate's right to use the "Deloitte"
name and the owner's ability to register the yacht in France,
"[t]he Republic has no rights to purchase or receive gas under
the Underlying Contract." (Id. at 6). But this is not the sole
direct benefit that redounded to the Republic. Instead, it was

47

the discharging of the duties of the Trade Agreement, that flowed directly from the formation of the Underlying Contract that was the benefit to the Republic. The Republic does not really dispute that there was a benefit – the only dispute is over the directness – a dispute that was resolved above. The Court therefore does not find the Republic's attempt to distinguish the cases compelling.

The Republic additionally counters on a high level that Plaintiff's argument would mean "every foreign state would be bound by the dispute resolution clause in every private contract that might offer some benefit to the foreign state's citizens." (Id. at 3). This is simply not the case. As shown in the alter ego analysis, this is not a "private contract" between two private parties. Moldovagaz is an alter ego of the Republic. Not all national energy companies are alter egos of their sovereigns. It is the unique alter ego relationship between the Republic and Moldovagaz that mitigates any concern about a broader reading of direct benefit estoppel theory.

c. Venue

Defendant contends that this Court is an improper venue for the claims brought by Plaintiff. (Defendant Republic Of Moldova's Memorandum Of Law In Support Of Its Motion To Dismiss The Renewal Complaint For Lack Of Subject Matter Jurisdiction Under The FSIA And For Improper Venue ("Def. Supp."), dated Aug.

10, 2018 [dkt. no. 102], at 14). In a civil action against a
foreign state, venue is proper: "(1) in any judicial district in
which a substantial part of the events . . . giving rise to the
claim occurred[;] . . . (4) in the United States District Court
for the District of Columbia if the action is brought against a
foreign state or political subdivision thereof." 28 U.S.C.
§ 1391(f)(1), (4).

Defendant's argument relies on the premise that the initial
default judgement against the Plaintiff, (Order and Default
Judgement, dated Jul. 14, 2000 [dkt. no. 14 in 99-CV-11962]),
cannot serve as the basis for establishing venue under 28 U.S.C.
§ 1391(f)(1). (Def. Supp. at 15). Defendant contends that
because "[Plaintiff] seeks to renew a judgement recognizing a
Russian arbitral award arising from a contract between Moldovan
and Russian companies to supply gas in Moldova . . . none of the
'significant' or 'material' events giving rise to Plaintiff's
claims occurred in this District." (Id. at 15). Therefore,
Defendant argues, the District of Columbia is the only venue
that § 1391(f) authorizes in the United States. (Id. at 14).

Plaintiff contends that the initial default judgment from
2000 is the "substantial part of the events" that makes venue in
this Court proper. Plaintiff's Memorandum of Law in Opposition
To Defendant Republic Of Moldova's Motion To Dismiss The Renewal

49

Action And Motion To Vacate The 2000 Judgment ("Pl. Opp. Mem."), dated Sept. 28, 2018 [dkt. no. 106], at 19). Plaintiff points out that the instant renewal action is not an action to enforce an arbitral award, but rather a separate, plenary action that is distinct from the original proceeding. (Id.) Because the claim in this case is based on the renewal of the 2000 default judgement, the fact that the original judgement was entered in this Court makes venue proper for the instant action under § 1391(f)(1). (Id. at 20).

This appears to be an issue of first impression, at least insofar as whether an original default judgement can serve as the "substantial part of the events" under § 1391(f)(1) to retain venue in a subsequent motion to renew. This Court agrees with the Plaintiff's analysis and finds that the Southern District of New York is a proper venue for the instant renewal action.

While it is not disputed that all of the substantial events that lead to the arbitration award and the arbitration itself occurred outside of the United States, the instant claim is not an attempt by Plaintiff to re-litigate anything that occurred outside of the United States. The instant claim is a renewal claim, which by definition is dependent on the existence of the original default judgement. As the Defendant concedes, venue in

the original proceeding is no longer subject to challenge, (Def. Supp. at 15), and so it is proper to assert that venue is grounded in that original proceeding and therefore proper in the Southern District of New York.

Holding otherwise would further incentivize foreign sovereigns to ignore the internationally sanctioned summons of the Court and, when it suits them, to raise the argument that Defendants raise here in order to allow them to litigate an issue twenty years after the initial resolution of the initial claim. If it had wished to challenge venue it should have done so by responding to the initial complaint in 2000.

IV. Conclusion

The Republic's motion to dismiss the renewal complaint [dkt. no. 101 in 16-CV-4118] and motion to vacate the default judgment [dkt. no. 66 in 99-CV-11962] are denied. Moldovagaz's motion to dismiss the renewal complaint [dkt. no. 79 in 16-CV-4118] and motion to vacate the default judgment [dkt. no. 45 in 99-CV-11962] are denied. Counsel shall confer and inform the Court by letter no later than two weeks how they propose to proceed.

SO ORDERED.

Dated:    New York, New York
          September 27, 2019

_Loretta A. Preska_
_____
LORETTA A. PRESKA
Senior United States District Judge